WASHINGTON TRUST CO. OF CITY OF NEW YORK v. DUNAWAY et al.

(Circuit Court of Appeals, Ninth Circuit. February 23, 1909.)

No. 1,627.

1. RAILROADS (§ 163*)—MORTGAGES—VALIDITY—ALASKA RAILROAD ACT.

By Act May 14, 1898, c. 299, 30 Stat. 409 (U. S. Comp. St. 1901, p. 1575), Congress granted right of way over public lands of the United States in Alaska to any railroad company complying with its provisions, which required the filing of a preliminary map of the location of its road, and within a year after its approval a map and profile of definite location of at least a 20-mile section, and the same each year until completion. It provided that the filing of the preliminary survey and map should during the ensuing year have the effect to render all the lands on which such

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

survey should pass subject to such right of way. Also, that mortgages executed by any company acquiring right of way thereunder should be recorded with the Secretary of the Interior, and should be a lien upon all the rights and property of the company as therein expressed, and that the right of way of a company should not be assigned or transferred until at least one-fourth of the proposed mileage of its road had been constructed, except by mortgages given to aid in its construction. There was also a provision that, on proof that actual surveys had been previously made or construction commenced, rights under the act should relate back to the date of such survey or commencement of work. The Council City & Solomon River Railroad Company, under its then corporate name, filed its preliminary map of location under said act in 1903, and afterward commenced the actual construction of its road. In 1905 it executed a mortgage on all of its property then owned or to be thereafter acquired to secure bonds to be used for construction purposes, which mortgage was recorded as required by the act. It had not at that time complied with the provision requiring the filing of map and profile of definite survey, but the time for doing so and for completion of its road was afterward extended by special act of Congress with which it complied. *Held* that, having in view the purpose of the legislation to encourage the building of roads, the mortgage was within the scope of its provisions and constituted a valid lien on the company's property.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 505; Dec. Dig. § 163.*]

2. RAILROADS (§ 165*)—MORTGAGES—RECORDING—ALASKA RAILROAD ACT.

Act May 14, 1898, c. 299, 30 Stat. 411 (U. S. Comp. St. 1901, p. 1578), granting right of way for railroads over lands of the United States in Alaska, provides, in section 6, that "all mortgages executed by any company acquiring a right of way under this act, upon any portion of its road that may be constructed in said District of Alaska shall be recorded with the Secretary of the Interior and the record thereof shall be notice of their execution and shall be a lien upon all the rights and property of said company as therein expressed, and such mortgage shall also be recorded in the office of the Secretary of the District of Alaska and in the office of the Secretary of the state or territory wherein such company is organized." *Held*, that such provisions contemplated a mortgage on the road as an entirety, including right of way, roadbed, track, rolling stock, and appurtenant property, and that the general provisions of the subsequent Alaska Code of June 6, 1900 (Carter's Ann. Codes Alaska, §§ 514, 515), requiring chattel mortgages to be recorded in the precinct where the mortgagor resides and where the property is, and to be renewed each year, did not apply to such a railroad mortgage nor repeal the special provisions for its recording.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 165.*]

3. STATUTES (§ 162*)—REPEAL BY IMPLICATION—SPECIAL AND GENERAL ACTS.

A special statute is not repealed by implication by a later general statute, although the latter is broad enough in its terms to include the same subject-matter, unless they are manifestly inconsistent.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 235; Dec. Dig. § 162.*]

Appeal from the District Court of the United States for the Second Division of the District of Alaska.

This is an appeal from an order of the District Court of Alaska, Second division, refusing a preliminary injunction.

The case shows that the appellee Alice Dunaway recovered in that court a judgment against the Council City & Solomon River Railroad Company for $7,500 as damages sustained by her while a passenger upon its railroad, upon which judgment an execution was issued and levied by the appellee Powell,

as United States marshal for the Second division of the District of Alaska, upon certain locomotives, cars, and other articles of personalty of the railroad company used by it in the operation of its road. The marshal having advertised the property for sale to satisfy the judgment and costs, the appellant, by virtue of a mortgage executed to it by the railroad company prior to the institution of the action for damages, brought the present suit to obtain an injunction preventing the sale of the property by the marshal.

The pleadings show that the Council City & Solomon River Railroad Company was organized under the laws of the state of New Jersey, and was originally incorporated March 27, 1902, under the corporate name of the "Western Alaska Construction Company," but that on the 17th day of February, 1905, its original corporate name was, pursuant to the laws of the state of New Jersey, changed to "Council City & Solomon River Railroad Company"; that by its charter the corporation was, among other things, authorized "to survey, locate, construct, operate, own and maintain a railroad with one or more main tracks, together with all necessary or convenient sidetracks, spurs, switches and turnouts, from a point at or near the mouth of Solomon river within or adjacent to the limits of Solomon City in the territory of Alaska, in the United States of America, northeastwardly to a point within or adjacent to the limits of Council City in said territory, and thence to such point within or adjacent to the limits of said Council City as may be convenient or necessary for the purpose of there connecting said railroad with other railroad or railroads now or hereafter found in or adjacent to said Council City"; that the company, for the purpose of availing itself of the rights granted by an act of Congress entitled, "An act extending the homestead laws and providing for right of way for railroads in the District of Alaska, and for other purposes," approved May 14, 1898 (Act May 14, 1898, c. 299, 30 Stat. 409 [U. S. Comp. St. 1901, p. 1575]), did, on the 20th day of February, 1903, file with the Secretary of the Interior a duly certified copy of its articles of incorporation and due proof of its organization thereunder, all of which was approved by the Secretary of the Interior and accepted for filing in his office on the date last mentioned, and that thereafter, to wit, July 2, 1903, the company filed with the Secretary of the Interior a preliminary actual survey and plat of its proposed route, together with plats of its station and terminal grounds, all in duplicate, in accordance with the provisions of section 4 of the aforesaid act of Congress, which preliminary survey and plat were approved and filed in the office of the Secretary of the Interior, and duplicates thereof were thereafter and during the year 1903 forwarded to and filed with the register and receiver of the land office of the United States at Juneau, Alaska; that the company thereafter commenced the actual construction of its road along the line of said route, and thereafter, to wit, April 9, 1904, an act of Congress (33 Stat. 165, c. 1135) was passed, entitled "An act for the relief of the Western Alaska Construction Company's Railroad," providing that the time of the company to comply with the provisions of sections 4 and 5 of chapter 299 of the aforesaid act of May 14, 1898, "in acquiring and completing its railroad now under construction in Alaska, is hereby extended as follows:

"First. The time to file the map and profile of definite location of its first section of at least twenty miles with the register of the land office in the District of Alaska, as provided in said sections four and five, is hereby extended to and including the thirty-first of December, nineteen hundred and four.

"Second. The time to complete the first section of at least twenty miles of its railroad as provided in said section five, is hereby extended to and including within one year after the filing and approval of the definite location of said section of said railroad as in said chapter and by this act is provided; and such railroad company shall be entitled to all the benefits conferred upon it by the provisions of such act upon its due compliance with all the provisions thereof, excepting only the provisions thereof, relating to the filing of the map and profile of definite location of its first section of not less than twenty miles of its road within twelve months after the filing with the Secretary of the Interior of a preliminary actual survey and plat of its proposed route, as prescribed in said sections four and five of said act, and the

provision thereof relating to the completion of the said first section of its road within one year, as originally provided in section five of said act: Provided, that such railroad company shall file with the proper register of the land office for the District of Alaska, a map and profile of the first section of its road of at least twenty miles on or before December thirty-first, nineteen hundred and four, and shall complete such section of its said road within one year after such definite location has been approved by the Secretary of the Interior, as provided in said section five of said act."

That on the 11th day of January, 1906, Congress passed an act entitled, "An act to aid the Council City and Solomon River Railroad Company," reading as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled:

"That the time of the Council City and Solomon River Railroad Company to comply with the provisions of sections four and five of chapter one hundred and ninety-nine of the Laws of the United States, entitled 'An act extending the homestead laws and providing for a right of way for railroads in the District of Alaska, and for other purposes,' approved May 14th, 1898, in acquiring and building its railroad now under construction in Alaska, is hereby extended as follows:

"First. That the time to file the map and profile of definite location of its first section of at least twenty miles with the register of the land office in the District of Alaska, as provided in said sections four and five, is hereby extended to and including the thirty-first day of December, nineteen hundred and six.

"Second. That the time to build the first section of at least twenty miles of its railroad, as provided in said section five, is hereby extended to and including the thirty-first day of December, 1906, and the time for building its entire railroad, as provided in said section five, is hereby extended to and including December thirty-first, nineteen hundred and nine.

"Third. That it shall be lawful for the Council City and Solomon River Railroad Company to hereafter operate its railroad in the District of Alaska for a period to and including December thirty-first, nineteen hundred and nine, without the payment of the license fee of one hundred dollars per mile per annum on each mile operated, as provided in section twenty-nine of chapter one of the act entitled 'An act for making further provision for a civil government for Alaska, and for other purposes,' approved June sixth, nineteen hundred." Act Jan. 11, 1906, c. 4, 34 Stat. 6.

On December 20, 1906, the Council City & Solomon River Railroad Company filed with the register of the land office at Juneau a map and profile of a 20-mile section of its railroad as definitely fixed, which map and profile was thereafter, to wit, June 26, 1907, approved by the Secretary of the Interior; that 20-mile section being completed by the railroad company prior to December 31, 1906.

The mortgage under which the appellant claims was executed to it as trustee on the 1st day of May, 1905, and was given to secure an issue of $350,-000 of the company's bonds, negotiable in form and bearing interest, and which mortgage was in the usual form of corporate mortgages given for like purposes. It purported to cover all of the realty and personalty of the mortgagor and all of its after-acquired property. It was duly acknowledged, and contained the affidavit of the secretary of each of the companies that it was made in good faith to secure the payment of the bonds, without any design to hinder, delay, or defraud creditors. It was recorded with the Secretary of the Interior, in the office of the Secretary of the District of Alaska, and with the Secretary of the State of New Jersey. It does not appear that it was ever filed, recorded, or indexed as a chattel mortgage in the Nome recording district, or that any affidavit of renewal of the mortgage was made, pursuant to the provisions of the act of June 6, 1900, regarding the making of chattel mortgages in Alaska.

Section 2 of the act of May 14, 1898, granted, among other things, the right of way through the lands of the United States in the District of Alaska "to any railroad company duly organized under the laws of any state or territory, or by the Congress of the United States, which may hereafter file for record

with the Secretary of the Interior a copy of its articles of incorporation and due proofs of its organization under the same, to the extent of one hundred feet on each side of the center line of said road," with certain provisions not important to be mentioned.

Section 5 of the act of May 14, 1898, is, in part, as follows:

"That any company desiring to secure the benefit of this act shall, within twelve months after filing the preliminary map of location of its road, as hereinbefore prescribed, whether upon surveyed or unsurveyed lands, file with the register of the land office for the district where such land is located, a map and profile of at least a twenty mile section of its road, or a profile of its entire road, if less than twenty miles, as definitely fixed, and shall thereafter, each year, definitely locate and file a map of such location as fixed of not less than twenty miles additional of its line of road until the entire road has thus been definitely located, and upon approval thereof by the Secretary of the Interior, the same shall be noted upon the record of said office, and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way," etc.

Section 6 of the act of May 14, 1898, is, in part, as follows:

"That all mortgages executed by any company acquiring a right of way under this act upon any portion of its road that may be constructed in said District of Alaska shall be recorded with the Secretary of the Interior, and the record thereof shall be notice of their execution, and shall be a lien upon all the rights and property of said company, as therein expressed, and such mortgage shall also be recorded in the office of the Secretary of the District of Alaska, and in the office of the Secretary of the state or territory wherein such company is organized."

And by section 8 of the same act it is, among other things, provided as follows:

"The right of way herein and hereby authorized shall not be assigned or transferred in any form whatever prior to the construction and completion of at least one-fourth of the proposed mileage of such railroad * * * as indicated by the map of definite location, except by mortgages or other liens that may be given or secured thereon to aid in the construction thereof; provided, that where within ninety days after the approval of this act proof is made to the satisfaction of the Secretary of the Interior that actual surveys, evidenced by designated monuments, were made, and the line of a railroad * * * located thereby, or that actual construction was commenced on the line of any railroad, * * * prior to January twenty-first, eighteen hundred and ninety-eight, the rights to inure hereunder shall, if the terms of the act are complied with as to such railroad, * * * relate back to the date when such survey or construction was commenced; and in all conflicts relative to the right of way or other privileges of this act, the person, company or corporation having been first in time in actual survey or construction, as the case may be, shall be deemed first in right."

Albert Fink, Ira D. Orton, J. C. Campbell, W. H. Metson, F. C. Drew, C. H. Oatman, and J. A. MacKenzie, for appellant.

Charles E. Shepard, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). Since the record shows that practically all of the rolling stock and other personalty used in the operation of the road in question was covered by the levy and proposed sale by the marshal, it does not admit of doubt that, if the appellant's mortgage is valid as against the appellee's judgment, the mortgage security would be impaired and largely destroyed by the sale under the levy. The real question in the case, therefore, is, whether or not the mortgage is valid as against the judgment creditor. The appellee insists that it is not, for the reason that it was not made by a company "acquiring a right of way" under the provisions of section

6 of the act of May 14, 1898; was prohibited by the provisions of section 8 of that act; and that, even if valid as between the parties thereto, the mortgage, in so far as concerned the personal property covered by it, was void as to the creditors of the mortgagor, because the holder of the mortgage did not conform to the provisions of the statute in Alaska in regard to chattel mortgages, which are to the effect that chattel mortgages must be filed in the recording district where the chattels are situated, and that each year an affidavit must be made and filed one month before its expiration showing that the mortgage debt has not been paid (if such be the fact), in order to continue the life of the mortgage.

It is contended that no right of way was or could be acquired prior to the filing and approval of the definite route of the road, and that until that was done no mortgage was authorized. The provisions of the act in question do not, we think, sustain that contention. The terms of the grant contained in section 2 are in præsenti, and by section 4 it is provided that any company embraced by the act—

"by filing with the Secretary of the Interior a preliminary actual survey and plat of its proposed route shall have the right at any time within one year thereafter to file the map and profile of definite location provided for in this act, and such preliminary survey and plat shall, during the said period of one year from the time of filing the same, have the effect to render all the lands on which said preliminary survey and plat shall pass, subject to such right of way."

The next section (5) provides that any company desiring to secure the benefits of the act shall, within 12 months after filing the preliminary map of location of its road, file with the register of the land office for the district a map and profile of at least a 20-mile section, or a profile of its entire road, if less than 20 miles, as definitely fixed, and shall thereafter each year definitely locate and file a map of such location of not less than 20 miles additional until the entire road has been thus definitely located, and upon approval thereof by the Secretary of the Interior the same shall be noted upon the records of his office, and that thereafter all lands over which such right of way shall pass shall be disposed of subject to such right of way:

"Provided, that if any section of said road shall not be completed within one year after the definite location of said section was approved, or if the map of definite location be not filed within one year, as herein required, or if the entire road shall not be completed within four years from the filing of the map of definite location, the rights herein granted shall be forfeited as to any such uncompleted section of said road, and thereupon shall revert to the United States without further action or declaration, the notation of such uncompleted section upon the records of the land office shall be cancelled, and the reservation of such lands for the purposes of said right of way, stations and terminals shall cease and become null and void without further action."

In respect to this road, as has been seen, the time for the filing of the map and profile of definite location of the first 20-mile section was extended to December 31, 1906, and the time for building the entire road to December 31, 1909, by virtue of the acts of April 9, 1904, and January 11, 1906.

The record shows that the appellant under its then corporate name did on the 20th of February, 1903, file with the Secretary of the Inte-

rior a duly certified copy of its articles of incorporation and due proof of its organization thereunder, which were approved by the Secretary, and that thereafter, to wit, July 2, 1903, the company filed with the Secretary of the Interior a preliminary actual survey and plat of its proposed route, together with plats of its station and terminal grounds in duplicate, in accordance with the provisions of section 4 of the act of May 14, 1898; which preliminary survey and plat were approved and filed in the office of the Secretary of the Interior, and duplicates thereof thereafter, and during the year 1903, forwarded to and filed with the register and receiver of the land office at Juneau, Alaska, after which the company commenced the actual construction of its road along the line of the said route. It is true that the map and profile of the definite location of the road had not, nor had any portion of it, then been filed with or approved by the Secretary of the Interior; but the time for doing that had been extended by Congress to December 31, 1906. Congress, of course, well knew the then difficulties in the way of locating, as well as building, a railroad in that remote region, with but a few months in a year in which such work could be done with any degree of ease or economy, and with almost the entire population of the sparsely settled country intent on the hunt for gold. Accordingly, it not only extended the time for the filing of the map and profile of the definite location of the appellant's road, but by section 8 of the act of 1898 conferred upon any railroad company the benefits of that act that had prior to January 21, 1898, either actually commenced the construction of a line of railroad or had made actual survey therefor, evidenced by designated monuments along its line, provided that, within 90 days after the approval of the act of May 14, 1898, proof be made to the satisfaction of the Secretary of the Interior of such actual construction or actual survey. And in further pursuit of its manifest purpose to aid in the building of such roads, and the consequent opening up and developing of the Territory, Congress, by section 8 of its act of May 14, 1898, in prohibiting, as it did, the assigning or transferring in any form whatever of the right of way therein and thereby authorized prior to the construction and completion of at least one-fourth of the proposed mileage of such roads, as indicated by the map of their definite location, expressly excepted from such inhibition "mortgages or other liens that may be given or secured thereon to aid in the construction thereof," thereby, in our opinion, authorizing the mortgaging in aid of such construction of a road, partly constructed, as·was the case here, with the right of way, the actual preliminary survey of which had been made, approved, and filed in accordance·with the provisions of the act of May 14, 1898, and the time for the filing and approving of the definite location of which Congress extended by subsequent acts, within which time the requisite acts are shown to have been performed in the present case.

It remains to consider whether the mortgage in question is invalid as against the appellee, because of the failure of the appellant to comply with the provisions of the Alaska statute of June 6, 1900, relating to chattel mortgages. That depends upon whether the appellant company was authorized by the act of May 14, 1898, to mortgage,

as it did do by the mortgage in question, the road as an entirety— right of way, roadbed, track, rolling stock, and appurtenant property.

The provision of section 6 of the act of 1898, in relation to that matter, is in these words:

"That all mortgages executed by any company acquiring a right of way under this act, upon any portion of its road that may be constructed in said District of Alaska, shall be recorded with the Secretary of the Interior, and the record thereof shall be notice of their execution, and shall be a lien upon all the rights and property of said company, as therein expressed, and such mortgage shall also be recorded in the office of the Secretary of the District of Alaska, and in the office of the Secretary of the state or territory wherein such company is organized."

Here was a road partly constructed, with a right of way granted in præsenti, actually surveyed preliminarily in accordance with the statute, which preliminary survey was filed and approved as required thereby, prior to the execution of the mortgage, and subsequently definitely located within the extended time allowed by Congress.

By section 8 of the act of 1898, as we have seen, Congress authorized the mortgaging of such a road to aid in its construction prior to the completion of one-fourth of its proposed mileage, and when, by section 6 of the same act, it declares that such a mortgage "shall be a lien upon all the rights and property of said company as therein expressed," we think the provision manifestly covers the road as an entirety. And since by the same statute the record of such a mortgage in the office of the Secretary of the Interior, in that of the Secretary of the District of Alaska, and in that of the Secretary of the state or territory wherein it is organized, is made notice of its execution, such recordation, in our opinion, must be held notice to all the world.

Under the construction we have thus placed upon the act of Congress of May 14, 1898, it is clear that the provisions of the Alaska statute of June 6, 1900, in relation to chattel mortgages, do not apply to the appellant's mortgage, unless it be, as is contended on behalf of the appellee, that the provisions of the act of May 14, 1898, concerning the recordation of such railroad mortgages, and the effect thereof, were repealed by the chattel mortgage provisions of the act of June 6, 1900. Hammock v. Trust Co., 105 U. S. 77, 26 L. Ed. 1111; Illinois Trust & Savings Bank v. Seattle Electric Railway & P. Co., 82 Fed. 936, 27 C. C. A. 268.

At the time that Congress by its act of May 14, 1898, provided that mortgages executed under and pursuant to its provisions should be recorded in the office of the Secretary of the Interior, in that of the Secretary of the District of Alaska, and in the office of the Secretary of the state or territory where the mortgagor company was organized, and that such recordation "shall be notice of their execution and a lien upon all of the rights and property of said company as therein expressed," there was in force in Alaska its act of May 17, 1884 (Act May 17, 1884, c. 53, 23 Stat. 24), entitled "An act providing a civil government for Alaska," by section 4 of which the clerk of the court provided for by that act was made—

"ex-officio recorder of deeds and mortgages and certificates of location of mining claims and other contracts relating to real estate, and register of wills for said district, and shall establish secure offices in the towns of Sitka

and Wrangel, in said district, for the safe keeping of all his official records and all records concerning the reformation and establishment of the present status of titles to lands, as hereinafter directed"

—with a provision to the effect that the District Court thereby created—

"may direct, if it shall deem it expedient, the establishment of separate offices at the settlements of Wrangel, Oonalashka, and Juneau City, respectively, for the recording of such instruments as may pertain to the several natural divisions of said district most convenient to said settlements, the limits of which shall, in the event of such direction, be defined by such court"

—such offices to be in charge of certain commissioners provided for by the act, one of whom was required to reside at Sitka, one at Wrangel, one at Oonalashka, and one at Juneau City, each of whom the act provides shall, among other powers—

"have the powers of notaries public, and shall keep a record of all deeds and other instruments of writing acknowledged before them, and relating to the title to or transfer of property within said district, which record shall be subject to public inspection."

The act of May 17, 1884, also provided:

"That the general laws of the state of Oregon now in force are hereby declared to be the law in said district, so far as the same may be applicable and not in conflict with the provisions of this act or the laws of the United States."

Thus, while by the general organic Act of Alaska provision was made for the execution and recordation of deeds, mortgages and other instruments relating to real property, Congress, in enacting the statute of May 14th, 1898, departed from those provisions and specifically provided in and by the latter act the offices in which mortgages upon railroad properties, executed in pursuance of its provisions, should be recorded, and the effect· of such execution and recordation. To hold that such special provision enacted by Congress, relating to and embracing a particular class of property, was repealed by implication by the passage by the same legislative body of its general act of June 6, 1900, would not only do violence to the general rule upon the subject, but an examination of some of the provisions of that later general act in relation to chattel mortgages shows that they are inapplicable to the mortgages contemplated by and provided for by Congress in its act of May 14, 1898. For example, two of the sections of the act of June 6, 1900, are as follows:

"Every mortgage of personal property together with the affidavits of the parties thereto or a copy thereof, certified to be correct by the person before whom the acknowledgment has been made, must be filed in the office of the recorder of the precinct where the mortgagor resides and of the precinct where the property is at the time of the execution of the mortgage; or in case he is not a resident of the district, then in the office of the recorder of the precinct where the property is at the time of the execution of the mortgage; and the recorder must, on receipt of such mortgage or copy, endorse thereon the time of receiving the same, and file and keep the same in his office for the inspection of all persons, and shall enter in a book properly ruled and kept for that purpose, the names of all the parties—the names of the mortgagors alphabetically arranged—the consideration thereof, the date of its maturity, and the time of filing the same.

"Every mortgage filed as provided in this chapter shall be void as against the creditors of the person making the same, or against subsequent purchasers or mortgagees in good faith, after the expiration of the term of one year from the filing thereof, unless within thirty days next preceding the expiration of the term of one year a true copy of such mortgage, with a verified statement exhibiting the interest of the mortgagee in such property at the time the same is renewed, as claimed by virtue of such mortgage, is again filed in the office where the original was filed; and the effect of such renewal shall be to extend the lien of the mortgage as against the creditors, purchasers and encumbrancers of the property for the further term of one year."     Sections 314, 315, pt. 5, c. 31, Carter's Ann. Codes Alaska.

The appellant, being a corporation of the state of New Jersey, never was a resident of any precinct in Alaska, and the property in question was and is not only of such a character that it was not confined to any particular precinct but the mortgage itself covered after-acquired as well as then existing property.

But apart from these considerations, it is, as said and shown by the Supreme Court in Rodgers v. United States, 185 U. S. 83–87, 22 Sup. Ct. 582, 583, 46 L. Ed. 816—

"a canon of statutory construction that a later statute, general in its terms and not expressly repealing a prior special statute, will ordinarily not affect the special provisions of such earlier statute. In other words, where there are two statutes, the earlier special and the later general—the terms of the general broad enough to include the matter provided for in the special—the fact that the one is special and the other is general creates a presumption that the special is to be considered as remaining an exception to the general, and the general will not be understood as repealing the special, unless a repeal is expressly named, or unless the provisions of the general are manifestly inconsistent with those of the special.  In Ex parte Crow Dog, 109 U. S. 556, 570, 3 Sup. Ct. 396, 405, 27 L. Ed. 1030, this court said:  'The language of the exception is special and express; the words relied on as a repeal are general and inconclusive.  The rule is, "Generalia specialibus non derogant."  "The general principle to be applied," said Bovill, C. J., in Thorpe v. Adams, L. R. 6 C. P. 135, "to the construction of acts of Parliament, is that a general act is not to be construed to repeal a previous particular act, unless there is some express reference to the previous legislation on the subject, or unless there is a necessary inconsistency in the two acts standing together."  "And the reason is," said Wood, V. C., in Fitzgerald v. Champenys, 30 L. J. N. S. Eq. 782, 2 Johns. & Hem. 31, 54, "that the Legislature having had its attention directed to a special subject, and having observed all the circumstances of the case and provided for them, does not intend by a general enactment afterwards to derogate from its own act when it makes no special mention of its intention so to do." '

"In Black on Interpretation of Laws, 116, the proposition is thus stated: 'As a corollary from the doctrine that implied repeals are not favored, it has come to be an established rule in the construction of statutes that a subsequent act, treating a subject in general terms and not expressly contradicting the provisions of a prior special statute, is not to be considered as intended to affect the more particular and specific provisions of the earlier act, unless it is absolutely necessary so to construe it in order to give its words any meaning at all.'

"So, in Sedgwick on the Construction of Statutory and Constitutional Law, the author observes, on page 98, with respect to this rule: 'The reason and philosophy of the rule is that, when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all.'

"And in Crane v. Reeder, 22 Mich. 322, 334, Mr. Justice Christiancy, speaking for the Supreme Court of that state, said: 'Where there are two acts or provisions, one of which is special and particular, and certainly includes the matter in question, and the other general, which, if standing alone, would include the same matter and thus conflict with the special act or provision, the special must be taken as intended to constitute an exception to the general act or provision, especially when such general and special acts or provisions are contemporaneous, as the Legislature is not to be presumed to have intended a conflict.'

"Both the text-books and the opinion just quoted cite many supporting authorities."

We are of opinion that the appellant's mortgage is valid as against the appellee's judgment. The order is accordingly reversed, and the case remanded to the court below for further proceedings in accordance with the views above expressed.